UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

UNITED STATES OF AMERICA,

    *-against-*

SAMUEL WHITESIDE,

    *Defendant.*

----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-13-16

13 Cr. 576 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

On September 10, 2015, Defendant Samuel Whiteside pleaded guilty to a two-count superseding indictment charging him with (i) traveling interstate with intent to commit a crime of violence ("namely, the assault and/or murder of Anthony Martino") to further unlawful activity ("namely, . . . prostitution offenses"), in violation of 18 U.S.C. § 1952(a)(2); and (ii) knowingly persuading, inducing, enticing or coercing individuals to travel interstate to engage in prostitution, in violation of 18 U.S.C. § 2422(a).

Whiteside admits that he killed Anthony Martino, a rival pimp, in the early morning of June 5, 2012 by stabbing him in the neck at the Metro Hotel on 241st Street in the Bronx, New York. But the parties vigorously dispute the factual circumstances that resulted in Martino's death and, consequently, the applicable "crime of violence" that Whiteside committed. The Government contends that Whiteside committed first degree murder; Whiteside argues that he committed a "non-murder offense." Dkt. 88, 89.

On July 18 and 19, 2016, the Court held a *Fatico* hearing to resolve the dispute, at which four Government witnesses and Whiteside testified. The parties submitted post-hearing briefs on August 9, 2016; and reply briefs on August 23, 2016.

1

The Court finds that the Government has failed to prove by a preponderance of the evidence either of the elements that constitute murder: namely, premeditation and malice aforethought. 18 U.S.C. § 1111(a). Rather, the Court finds that Whiteside unlawfully killed Martino in the heat of passion, and so holds that the applicable crime of violence for Count 1 is voluntary manslaughter, as defined at 18 U.S.C. § 1112(a).

## BACKGROUND

### I.    Procedural History

On September 10, 2015, Whiteside pleaded guilty to both counts of the superseding indictment pursuant to a *Pimentel* letter. At the guilty plea, the Government represented that its proof of guilt as to Count 1 was as follows:

> The government's evidence . . . would include testimony of former prostitutes who worked for the defendant during the charged period. . . . [T]he government's evidence would include witness testimony relating to the defendant's travel between June 4th and June 5th, 2012. During that travel the defendant was in telephone contact with Anthony Martino, who was another pimp from Boston. And during that travel there was an argument between Mr. Whiteside and Mr. Martino, which was overheard by people who were with Mr. Martino at the time in a motel room in the Bronx, New York. The argument was over the prostitution businesses of both Mr. Whiteside and Mr. Martino. Mr. Martino had sold a prostitute to Mr. Whiteside earlier, who then left very quickly Mr. Whiteside's prostitution business, and Mr. Whiteside – we would have testimony from witnesses that Mr. Whiteside was very angry about that and about the loss of that money that he had paid for that prostitute, and had been trying to confront Mr. Martino about that prostitute that had been traded between them.
>
> On the night of June 4th into June 5th, 2012, the defendant went to the Metro Motel, where Anthony Martino was staying. He pushed his way into the motel room and stabbed Anthony Martino three times, one time in the neck, resulting in Mr. Martino's death. And we would have video surveillance evidence, as well as witnesses who were – at least one witness who identified Mr. Whiteside leaving the motel room after the stabbing, as well as admissions made by Mr. Whiteside to certain prostitutes who worked for him about this happening.

Plea Hearing Transcript, Dkt. 69, at 12:5-13:14. In his allocution, Whiteside testified:

> From June 4, 2012, to June 5, 2012, I traveled from the Boston area to New York, during which time I had a cell phone conversation with Anthony Martino

when I developed the intent to fight him as a result of a dispute we were having regarding our prostitution business.

Upon arriving at the Metro motel in the Bronx, I physically confronted Anthony Martino, and then we fought in furtherance of my ongoing prostitution business. While I never intended to kill or cause death to Mr. Martino, he died as a result of my fight with him, for which I am truly sorry for.

*Id.* at 14:3-12. When asked to describe his assault on Martino, Whiteside answered: "In the course of me fighting with Mr. Martino, I stabbed him." *Id.* at 15:4-5. The Court asked how many times, and Whiteside said, "I believe three times." *Id.* at 15:7.

On March 10, 2016, the Probation Office filed its presentence report ("PSR"). The PSR sets forth (i) the Government's position that the applicable crime of violence for Count 1 is first degree murder, resulting in a base offense level of 43 and a guideline range of 360 months to life; and (ii) Whiteside's position that the crime of violence is voluntary manslaughter, resulting in a base offense level of 29 and a guideline range of 78 to 97 months.[1]  PSR ¶¶ 37, 62, 147. Due to the significant factual disputes, the PSR does not include a recommended sentence.

## II.   *Fatico* **Hearing**

On July 18 and 19, 2016, the Court held a *Fatico* hearing to resolve the dispute over Whiteside's underlying crime of violence. Five witnesses testified: (i) Susan Ely, a senior medical examiner at the New York Office of Chief Medical Examiner; (ii) M.S., a prostitute who worked for Whiteside;[2] (iii) Amir Hollinshed, who was with Martino on the day of the incident and was hiding in the motel room's bathroom when Whiteside killed Martino; (iv) Derrel Wilson, who was with Martino for a time on the day of the incident; and (v) Whiteside himself.

A number of exhibits were introduced into evidence, but the most important evidence is

---

[1] The parties agree that Whiteside is in criminal history category II and is entitled to a two-point offense level reduction for acceptance of responsibility. PSR ¶¶ 60, 81, 91.

[2] The Court refers to the witness by her initials to protect her privacy.

time-stamped video footage from the Metro Hotel that shows several angles of the motel's exterior, including outside the room where Whiteside killed Martino.

### A.   Dr. Susan Ely

Dr. Susan Ely testified that she conducted an autopsy of Martino on June 6, 2012, and determined that he suffered three stab wounds: the right lower neck, the side of the right chest, and the back of the abdomen. *Fatico* Hearing Transcript ("Tr."), at 22:19, 27:2, 28:2-3. She testified that the fatal wound was the stab wound in the neck, which "was 7/8 inches on the surface of the skin . . . The depth of the wound is 3.5 to 4 inches in the body. That's how far the knife went into the body. While penetrating the body, it [i.e., the knife] went through several vital structures, vital vascular structures: blood vessels in the neck, specifically the right carotid artery, the jugular vein, and the right subclavian artery and vein. These are three, the three, major blood vessels, including both arteries and veins, in the neck." Tr. 22:25-23:11.

Dr. Ely further testified that "[a]s a result of this . . . stab wound, and these major blood vessels of the right neck having been penetrated, there would have been robust and swift bleeding." Tr. 24:3-6. She opined that such rapid blood loss would cause loss of consciousness, and possibly death, "on the order of minutes." Tr. 24:16-19, 33:5-8. Dr. Ely's autopsy report indicates that, other than the stab wounds, she observed a "contusion of right upper lip," but "no facial fractures or discernible trauma." Ex. 3505-2 at 1, 3.

### B.   M.S.

M.S. testified that she worked for Whiteside as a prostitute from February 2012 until February 2013. Tr. 40:20-41:20, 45:2-9. She initially worked in North Carolina, and later worked at hotels in Boston and strip clubs in Providence. Tr. 44:1-15.

M.S. testified that the prostitutes who worked for Whiteside "weren't allowed to talk to

other guys unless they were potential clients, especially other pimps." Tr. 46:12-13. If they did, Whiteside resorted to physical violence. Tr. 46:14-18. She described an incident in which Whiteside hit her for talking to another pimp. Tr. 46:19-47:3. She also recalled several other fights during which Whiteside hit her and choked her, resulting in bruises. Tr. 47:4-48:16. M.S. also witnessed Whiteside using physical violence on other prostitutes. Tr. 48:17-50:25. M.S. testified that Whiteside and most of the women who worked for him carried pocket knives for protection. Tr. 59:8-60:14.

M.S. described an incident involving a prostitute named Rose, who initially worked for Martino (who M.S. knew by the nickname "Jim Jones"). M.S. heard that Whiteside paid Martino to have Rose work for Whiteside. Tr. 52:21-25. Rose left, however, to return to Martino. Tr. 53:3-9. M.S. explained that Whiteside was upset because he believed that Martino had taken advantage of him. Tr. 53:13-15. Whiteside tried to arrange a meeting with Martino in Atlantic City, but Martino did not show up. Tr. 53:22-54:20.

One week later, while M.S. was working at a hotel in East Brunswick, New Jersey, Whiteside called her from Boston and told her that "Jim Jones had told him to come to the hotel that he was at for them to talk about whatever had happened with the Rose situation." Tr. 55:2-56:24. Whiteside sounded "kind of amped up" over the phone; but he never said that he planned to kill Martino. Tr. 57:4-6, 69:12-14. Immediately after the incident with Martino, Whiteside picked up M.S. at the East Brunswick hotel, and she observed what looked like blood on his shoes. Tr. 57:11-14. Whiteside said that "he had gotten in a fight with Jim Jones, he had stabbed him, but he didn't know – he said he was in bad condition but he didn't know if he was just hurt or if something worse had happened." Tr. 57:16-19. Whiteside told M.S. that someone else had been in the motel room who ran into the bathroom during the fight. Tr. 57:24-58:1.

5

Whiteside also said to M.S. that "Jim Jones had like a gun in a bag that he had like held up to him when he went in the hotel room." Tr. 59:2, 73:11-17.

Whiteside and M.S. then drove to Providence, where Whiteside had a court appearance the next day. Tr. 58:3-9. After the court appearance, they drove to New Jersey, making several stops along the way, including a stop in the Bronx. Tr. 58:11, 79:8-10. They then took a bus to Chicago. Tr. 58:11-12. They were later told that Martino had died. Tr. 75:2-4. M.S. described Whiteside's reaction to the news as "scared" but not "shocked." Tr. 75:8-15.

### C.   Amir Hollinshed

Amir Hollinshed testified that in June 2012 he lived on 241st Street in the Bronx, near the Metro Hotel. Tr. 88:23-89:6. His primary source of income was selling marijuana. Tr. 89:17-18. On the night of June 4, 2012, he went to the Metro Hotel to sell marijuana to Martino (who Hollinshed knew by the nickname "Jay"). Tr. 89:19-90:1. Hollinshed arrived at Room 18, where Martino was staying, and saw Martino and about four other people smoking marijuana and "chillin, hanging out." Tr. 91:23, 92:22-93:5. At some point that night, Hollinshed and Martino walked around outside, and Hollinshed saw Martino holding a black plastic bag; Hollinshed did not know what was inside. Tr. 100:21-23. Hollinshed did not see a black plastic bag with a gun in Room 18 and did not hear any discussions about a gun in a black plastic bag. Tr. 100:1-25. Eventually, the others left and only Hollinshed and Martino remained in Room 18. Tr. 92:14-16.

Martino received a phone call and Hollinshed overheard Martino "arguing with somebody," calling the person "a fake simp [slang for pimp]," saying "that he took his bitch from him, took his bitch back," and telling the caller "to come to 241st and Room No. 18." Tr. 92:1-13. Around fifteen or twenty minutes later, a man "bum-rushed" into the room. Tr. 93:7-

14, 115:9. As the man entered, the door hit Martino on the head, causing him to bleed. Tr. 113:21-114:1, 123:18-21. The man was dressed in yellow and green, and entered the room wielding a knife. Tr. 93:16-21, 117:22-24. The man said something about money and "robb[ing] my girl." Tr. 93:25-94:12.

Martino ran away from the man and jumped onto the bed, and then both Martino and Hollinshed ran into the bathroom. Tr. 94:1-12, 118:4. While they were in the bathroom, "Jay said he got this, and he went back out and [Hollinshed] stayed in the bathroom." Tr. 94:14-15. Hollinshed heard banging outside that sounded like fighting. Tr. 94:18-20. Hollinshed did not see Martino holding a weapon when the man entered the room or when they were in the bathroom. Tr. 94:21-95:1, 118:17-18.

When Hollinshed exited the bathroom, he saw blood prints on the wall. Tr. 95:9-10. Martino was lying on the bed and said, "I'm bleeding a lot. I'm dying." Tr. 95:11. Hollinshed tried to help Martino lift his head up and called for help. Tr. 95:14-15. A motel employee arrived and called the police. Tr. 95:15. Hollinshed stayed until the police arrived. Tr. 95:18.

**D.   Derrel Wilson**

Derrel Wilson testified that he was friends with Martino (who he knew by the nickname "JJ") and he knew that Martino worked as a pimp in the vicinity of 241st Street in the Bronx. Tr. 131:19-133:18. Wilson himself has prior convictions for narcotics distribution and promoting prostitution, and is currently incarcerated. Tr. 129:5-131:18.

Wilson described an incident with Martino that occurred a day or two before June 4, 2012. Tr. 149:10-12. Someone had recently stolen Martino's car and over $10,000, and Martino was angry. Tr. 149:13-22. Wilson was with Martino when Martino confronted a rival gang member named "Drops" about the robbery. Tr. 150:8-21. At that encounter, Wilson saw Drops

7

flash a gun at Martino. Tr. 151:3. Soon after, Martino got a gun "because he felt he needed protection from Drops because he wasn't from the neighborhood." Tr. 151:10-15.

On the night of June 4, 2012, Wilson was in Room 18 at the Metro Hotel with Martino, along with "a younger kid [], and a couple other dudes that JJ knew, and some from the neighborhood." Tr. 133:21-136:12. Wilson identified Hollinshed as the "younger kid." Tr. 136:16-19. Wilson explained that the group was "hanging out, smoking and drink." Tr. 137:6. Martino told Wilson that he had a gun that did not work in a plastic bag in the room. Tr. 137:14-17. Wilson saw an ammunition magazine on the table, but never saw a gun. Tr. 137:12-13, 153:9-17.

Some time later, when only Wilson, Martino, and Hollinshed were in Room 18, Wilson overheard a fifteen- to twenty-minute conversation that Martino had on his cell phone's speakerphone. Tr. 137:18-138:1, 140:8, 142:22. On the phone were a Boston-based pimp named "Smooth" and Whiteside, who Wilson knew by the nickname "Aura." Tr. 138:2-139:6.

During the call, Martino and Whiteside were yelling, while Smooth was "[k]ind of laughing." Tr. 140:9-18. Martino and Whiteside were arguing over money; Wilson came to understand that Martino owed Whiteside at least $1,500 "[f]or a female." Tr. 140:19-141:4. Both were threatening the other: Martino told Whiteside he would "beat him up, hurt him, stuff like that," and Whiteside told Martino he would kill him. Tr. 141:11-22. Martino said to Whiteside: "You a bitch. Come see me. I'm in Room 18 at the Metro Motel, 241st Street." Tr. 142:10-11.

After the call, Martino said to Wilson: "[Whiteside's] a bitch. He ain't doing nothing. He ain't coming over here. He's probably in Boston anyway." Tr. 142:19-20. Wilson characterized Martino as "nonchalant about it." Tr. 142:21. Wilson then went outside and

walked down the street to a nearby store. Tr. 143:4-9. About thirty minutes later, on his way

back to the motel, a friend told Wilson that the door to Room 18 was open and Martino was lying

on the bed bleeding. Tr. 143:15-144:4. When Wilson returned to the motel, he looked in from

outside the room and saw Martino on the bed "taking deep breaths, trying to breathe," and "a lot

of blood." Tr. 144:8-15, 156:16-18, 159:7-8. Wilson also saw Hollinshed nearby. Tr. 145:3.

Soon after, police and an ambulance arrived. Tr. 144:19-20.

### E.   Samuel Whiteside

Finally, Samuel Whiteside testified. He stated that he ran a prostitution business from the

end of 2009 until his arrest in 2013, and acknowledged verbally abusing and physically

assaulting the women who worked for him. Tr. 173:8-16, 242:17-20.

Whiteside stated that Martino gave him Rose after Rose agreed to work with Whiteside.

Tr. 174:23-175:14. He gave Martino $500 at that time, but testified that the payment was

unrelated to Rose coming to work for him. Tr. 175:6-10, 212:5-213:5. Rose never worked for

Whiteside, and instead returned to Martino. Tr. 175:15-18. Whiteside ultimately did not want

Rose to work for him because she did not have identification to verify her age and another

woman working for Martino told Whiteside that Martino was "doing something sneaky with

[Rose]." Tr. 175:18-25. Whiteside believed that Martino had "put a girl with me to try to find

out where my money was, and he just did something disloyal that I wouldn't do to a friend." Tr.

176:11-13. Whiteside said he "didn't care about [Rose] going back to [Martino]. I was more

mad about what he did to me." Tr. 176:8-9, 215:6-13, 219:6-7.

After Rose left, Whiteside argued with Martino in several phone calls: Whiteside

demanded money and Martino refused. Tr. 176:15-16, 220:14-21. During Memorial Day

weekend of 2012, Whiteside was in Atlantic City. Tr. 176:23-177:2. He believed Martino was

also in Atlantic City and tried to arrange a meeting with one of Martino's prostitutes, hoping that Martino would come too and Whiteside could confront him. Tr. 177:22-25, 222:23-223:3. But he managed only to talk to Martino by phone because Martino was not in Atlantic City. Tr. 178:7-18. Whiteside testified that he had no intention to kill Martino. Tr. 178:6.

About a week later, on June 4, 2012, Whiteside was in Boston. Tr. 179:8-10. He planned to drive to East Brunswick to pick up M.S. at a hotel. Tr. 179:13-24. That night, while driving to New Jersey, Whiteside spoke for over two hours over the phone with Martino and Smooth. Tr. 179:25-180:20, 224:7-10. The conversation between Martino and Whiteside was heated, but Smooth was "mediating the situation." Tr. 180:12-15, 225:1-3. Whiteside explained: "We was arguing. [Martino] was saying what he did, that's part of pimping. I'm just saying to him, we're friends, so you shouldn't do that to me, it's bigger than that. And the argument was basically based around him just admitting that he was wrong." Tr. 181:5-9. At the end of the conversation, Martino admitted he was wrong and Whiteside said he wanted $5,000 that he had previously given to Martino. Tr. 181:10-13. Martino told Whiteside to come to Room 18 at the Metro Hotel to pick up the money. Tr. 181:14-21, 225:11-12.

After the conversation, Whiteside was angry because he wanted his money back and he was nervous because he had heard voices in the background. Tr. 181:22-182:4. He drove to the Metro Hotel and intended to fight if necessary to get his money back. Tr. 182:5-6. But he never planned or intended to kill Martino. Tr. 182:11-14.

When Whiteside arrived at the Metro Hotel, he stood outside Room 18 and heard voices inside. Tr. 182:15-19. He was armed with only a four-inch pocket knife that he carried for protection. Tr. 239:5-6, 245:16-246:2. He was nervous because he "didn't know what to expect" and "didn't know if [he] was going to get jumped." Tr. 183:11-12. He walked to a

10

nearby stairwell to collect his thoughts and "decide what I was going to do." Tr. 182:19-22, 184:10-12, 228:7-12.

Whiteside returned to Room 18, opened the door a few inches, and saw Martino near the door holding a black gun at his side. Tr. 185:2-11, 228:13-16. Whiteside then entered the room without his knife drawn and rushed toward Martino, fearing that Martino would shoot him if he tried to run away. Tr. 185:12-16, 226:3-23. He saw another person run into the bathroom, and he and Martino began fighting. Tr. 185:17-186:2. Whiteside grabbed the gun and it fell to the floor as they struggled. Tr. 186:3-11, 229:1-3. Whiteside feared that Martino would shoot him if he got the gun. Tr. 186:12-19, 232:16-17. As they were fighting, Martino bent down and tried to pick up Whiteside. Tr. 229:14-16. Whiteside pulled out his knife stabbed Martino in the side and the neck as Martino was bent over. Tr. 186:19-187:25, 226:19-24, 229:20-230:10. Whiteside then pushed Martino to the back of the room and was able to recover the gun from under the bed. Tr. 188:2-10. Whiteside taunted Martino because he had gotten his gun, and Martino said, "F you, you got it." Tr. 188:11-16. Whiteside did not stab or shoot Martino after getting the gun. Tr. 188:17-20. Whiteside described seeing minimal amounts of blood and said that had he seen more blood he would have called for an ambulance on Martino's phone. Tr. 230:13-25.

Whiteside saw a black plastic bag with a bottle of juice inside. Tr. 192:23-24. He took the juice out of the bag and left with the gun in the bag. Tr. 192:25. When he left, Martino was standing and bleeding in the back of the room. Tr. 188:23-189:4, 231:13-20. Whiteside ran down a street behind the motel and stashed the gun under the porch of a nearby house because he did not want to travel with the gun. Tr. 189:5-22. After that, he drove to East Brunswick. Tr. 189:23-24. On the way, he called M.S. and told her he had beaten up Martino and taken his gun.

11

Tr. 190:11-12. They spent the night in East Brunswick, and then drove to Providence the next day for Whiteside's court appearance. Tr. 190:22-191:3. From Providence, Whiteside and M.S. drove to Boston. Tr. 191:15-16.

While they were in Providence, Whiteside learned that Martino had died. Tr. 191:4-7. He was "shocked" because, based on how he left Martino, he did not expect that Martino would die. Tr. 191:11-14. Whiteside drove with M.S. and a friend back to the Bronx to recover the gun. Tr. 191:22-192:11. Both Whiteside and M.S. looked for the gun, and Whiteside found it. Tr. 192:12-17. Since Whiteside was traveling to Chicago, he gave the gun to a friend in New Jersey named "Bones" and told him to bury it. Tr. 192:18-21, 234:6-12. He spoke with Bones (whose real name and address Whiteside does not know) sometime later, but did not directly ask about the gun to avoid implicating Bones. Tr. 234:9-18, 235:7-11. Whiteside does not know the current location of the gun. Tr. 193:11-12.

### F.    Metro Hotel video

The video footage introduced into evidence contains sixteen different cameras located around the Metro Hotel, covering the time periods on June 5, 2012 from 12:30-1:00 am and 3:10-3:50 am. *See* GX 100A-G. The video shows the following images:

At 12:39 am, Martino enters the motel's office with Hollinshed behind him. GX 100B, camera 10, 11. Martino is holding a black bag and a drink in a bottle. *Id.* Martino has a conversation with a hotel employee, pays some money, and signs a form. *Id.* at 12:40-41. The employee gives something to Martino, who then leaves with the black bag and drink. *Id.* at 12:42. They walk to Room 18 and enter. GX 100B, camera 2 at 12:42:19. At 12:55 am, another man knocks on the door and enters the room. GX 110C, camera 2 at 12:55:20.

At 3:20 am, Whiteside walks up to the door. GX 100E, camera 2. He is wearing a

12

yellow shirt and a green hat. *Id.* Whiteside stands next to the door for a few seconds and then continues walking past the door to a nearby stairwell. *Id.*, camera 2, 9 at 3:20:17. In the stairwell, Whiteside takes an object that appears to be a cell phone out of his pocket and looks at it. *Id.* at 3:20:27. He then walks back to Room 18. *Id.*, camera 2 at 3:20:40. His back is to the camera, and he stands next to the door for a moment. *Id.* at 3:20:43. Then, at 3:20:46 am, Whiteside turns to face the camera and leans his right shoulder against the door to push it open. *Id.* Whiteside enters the room but then his foot reappears, as though something is forcing him back. *Id.* at 3:20:48. Then Whiteside is fully inside the room. *Id.* None of the images on the tape from 3:20:00-3:20:48 am show Whiteside holding a knife. *Id.* There are no video images of what occurred in Room 18.

At 3:22:04 am, a motel employee walks past Room 18 and knocks on the door for Room 19. *Id.* Whiteside exits Room 18 at 3:22:33 am, 1 minute and 45 seconds after he entered. *Id.* Whiteside is holding a black bag. *Id.* He sees the employee, turns around, and quickly walks away. *Id.* The employee knocks a few more times at Room 19, and then walks over to Room 18 and goes inside. *Id.* At 3:28 am, two men walk up to the room and look in. *Id.* A police officer arrives at 3:32 am and medical personnel arrive at 3:34 am. GX 100F, camera 2.

Meanwhile, Whiteside runs down a street behind the motel. GX 100E, camera 16 at 3:22:47. He first runs to a parked car, but then runs down a nearby street not visible on the video. *Id.* Ten seconds later, Whiteside reappears on the video as he returns to the car and drives away. *Id.*

13

## DISCUSSION

### I.    Applicable Law

In a *Fatico* hearing, the standard of proof is a preponderance of the evidence.[3] *See*
*United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000). The Federal Rules of
Evidence do not strictly apply, Fed. R. Evid. 1101(d)(3), and the Court may consider any
relevant information that has sufficient indicia of reliability. U.S.S.G. § 6A1.3(a). "The
procedures used at sentencing are within the discretion of the district court so long as the
defendant is given an adequate opportunity to present his position as to matters in dispute."
*United States v. Maurer*, 226 F.3d 150, 151 (2d Cir. 2000).

Federal law defines murder as "the unlawful killing of a human being with malice
aforethought." 18 U.S.C. § 1111(a). As relevant here, first degree murder requires a "willful,
deliberate, malicious, and premeditated killing." *Id.* Any other murder is second degree. *Id.*
Voluntary manslaughter is "the unlawful killing of a human being without malice . . . [u]pon a
sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). The critical distinctions here are (i)
whether Whiteside's actions were *premeditated*, to distinguish first and second degree murder;
and (ii) whether Whiteside acted with *malice* or rather upon *heat of passion*, to distinguish
murder and manslaughter.

---

[3] Despite previously agreeing that the preponderance of the evidence standard applies, Tr. 12:18, Whiteside now
argues that the Court must apply the higher clear and convincing evidence standard because the facts the
Government asks the Court to find (namely, that Whiteside committed first degree murder) would significantly
enhance the guideline range. Dkt. 89 at 13. Not so. The Second Circuit has expressly rejected that argument,
reversing where the district court applied the clear and convincing standard rather than the preponderance standard
because the disputed facts triggered significant sentencing enhancements. *Cordoba-Murgas*, 233 F.3d at 708-09. In
any event, the dispute here is academic because, for the reasons described below, the Government has failed to meet
even the lower preponderance standard.

14

"Premeditation means with planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing." *United States v. Begay*, 673 F.3d 1038, 1042-43 (9th Cir. 2011); *see also United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001). Relevant circumstantial evidence includes "planning activity," "motive," and the "nature of the killing." *Begay*, 673 F.3d at 1043 (quoting 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2009)).

Malice requires "some heightened degree of disregard for human life" or "reckless and wanton conduct on the part of a defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death." *United States v. Velazquez*, 246 F.3d 204, 214 (2d Cir. 2001). "Malice is not satisfied simply by killing with an intentional or reckless mental state; instead, malice specifically requires committing the wrongful act without justification, excuse, or mitigation." *United States v. Serawop*, 410 F.3d 656, 664 (10th Cir. 2005).

"Heat of passion is one legal excuse pursuant to which what would otherwise constitute murder is mitigated to a less culpable offense of manslaughter—because with heat of passion, 'malice' in the sense of 'lack of provocation' no longer exists." *Id.*; *see also United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir. 1993) ("[T]he defendant's showing of a 'heat of passion' is said to negate the presence of malice."). "[T]he basic inquiry is whether or not at the time of the killing, the reason and judgment of the defendant was obscured or disturbed by passion . . . to such an extent as would cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and from passion rather than judgment." *Velazquez*, 246 F.3d at 210. "[I]n some circumstances a physical altercation between two people can constitute

15

sufficient provocation to reduce second-degree murder to voluntary manslaughter." *Roston*, 986 F.2d at 1291.

## II.   Analysis

### A.   Findings of Fact

Having carefully reviewed the record and considered the testimony and other evidence, the Court makes the following findings of fact:

From around midnight to 3:30 am on June 5, 2012, Anthony Martino was in Room 18 at the Metro Hotel in the Bronx. GX 100A-G. Several people visited him—including Amir Hollinshed and Derrel Wilson—and Martino and his guests were enjoying themselves: talking, drinking, and smoking marijuana. Tr. 92:22-93:5, 133:24-25, 136:9-137:8. At some point, Martino was on a three-way phone call with Whiteside and Smooth, another pimp who was an acquaintance of both Whiteside and Martino. Tr. 92:1-8, 137:18-138:8, 142:22-143:3. Hollinshed and Wilson overheard the conversation. Tr. 92:14-16, 137:18-24.

Whiteside was driving south from Massachusetts to New Jersey, where he was to pick up M.S. at a hotel in East Brunswick. Tr. 55:2-56:24, 179:13-24. Whiteside and Martino were arguing over money and a prostitute named Rose, who had left Whiteside and returned to Martino. Tr. 140:19-141:4, 181:5-9. The argument was angry and acrimonious, and the two pimps exchanged threats to hurt or kill one another. Tr. 92:1-13, 141:11-22, 180:12-15. Martino told Whiteside where he was, and said if Whiteside wanted to resolve the problem he should go there. Tr. 56:17-24, 92:1-5, 142:10-11, 181:14-21, 225:11-21.

Whiteside went to the Metro Hotel; he was angry at Martino. Whiteside intended to confront Martino, demand money, and fight if necessary. Tr. 181:22-182:6. The Court finds that Martino had a gun in Room 18. All three of the Government's fact witnesses (along with

16

Whiteside) provided testimony that supports this finding. Wilson testified that Martino acquired a gun the previous day and told Wilson that he had a gun in Room 18 in a plastic bag. Tr. 137:14-17, 151:10-15. Hollinshed testified that he saw Martino holding a black plastic bag. Tr. 100:21-23. M.S. testified that, immediately after the incident, Whiteside called her and said Martino had a gun in a bag. Tr. 59:2-4, 73:11-17. And the video shows Martino entering Room 18 holding a black bag, and Whiteside later leaving the room holding a black bag. GX 100B, camera 2 at 12:42, 3:22.

When Whiteside arrived at the Metro Hotel at 3:20 am, he stopped briefly outside Room 18 and then walked to a nearby stairwell. GX 100E, camera 2, 9. After a brief pause, he walked back to Room 18. *Id.* He paused at the door, and turned around. *Id.* At 3:20:46 am, Whiteside leaned his right shoulder against the door and pushed in. *Id.* There was push back, and Whiteside stepped back before entering. *Id.*

As to what happened when Whiteside entered Room 18, the Court credits Whiteside's testimony and rejects Hollinshed's testimony. It does so for several reasons. First, Hollinshed testified that Whiteside had his knife drawn when he entered Room 18, but the video shows that he did not. *Compare* Tr. 93:15-19, 117:19-22 *with* GX 100E, camera 2 at 2:20:46. Second, Hollinshed testified that the door hit Martino on the head causing him to bleed, but the autopsy report and accompanying photographs of Martino show no injury to Martino's head. *Compare* Tr. 113:21-114:1, 123:18-21 *with* Ex. 3505-2 at 1, 3. Third, Hollinshed's testimony at the hearing inconsistent is with his statements at the time of the incident. At the hearing, Hollinshed said that both he and Martino ran into the bathroom, but in a written statement he prepared the night after the incident, Hollinshed only wrote that he ran into the bathroom. *Compare* Tr. 94:8-12 *with* Ex. 3506-2. Finally, the Court finds it improbable that in the 1 minute, 45 seconds that

17

Whiteside was in Room 18, there was enough time for Martino to get hit by the door, run and jump onto the bed, run into the bathroom, have a conversation with Hollinshed, exit the bathroom, and fight Whiteside. The Court finds it more likely that Whiteside entered the room and an immediate fight with Martino ensued, which also accounts for the video images of push back as Whiteside entered Room 18.

Accordingly, the Court finds that as Whiteside entered Room 18, he encountered Martino near the door holding a gun at his side. Tr. 185:2-11, 228:15-17. Whiteside grabbed for the gun, which fell to the floor, and a struggle ensued. Tr. 186:1-8, 229:1-6. Meanwhile, Hollinshed ran into the bathroom. Tr. 185:19-23. As they were fighting, Martino bent down to pick Whiteside up. Tr. 229:14-16. Whiteside was afraid that Martino would shoot him if he recovered the gun. Tr. 186:12-18, 232:14-17. Whiteside drew his knife and stabbed Martino three times: in the neck, the side, and the back. Tr. 22:19-20, 27:2, 28:2-3, 187:5-25, 229:20-230:10. The stab wound in the neck resulted in immediate, significant bleeding, and was ultimately fatal. Tr. 23:4-11, 24:3-6. At 3:22:33 am, Whiteside left Room 18 with the gun in a black bag. GX 100E, camera 2; Tr. 192:23-193:1. Although he was bleeding profusely, Martino was still alive and able to breathe and talk when Whiteside left. Tr. 95:9-12, 144:10-15, 156:16-18, 159:5-8, 188:11-16. Whiteside ran behind the motel and hid the gun under the porch of a nearby house. GX 100E, camera 16 at 3:22:57; Tr. 189:5-20. He then drove to East Brunswick to meet M.S. Tr. 189:23-24.

### B.   Conclusions of Law

The Government has the burden of showing by a preponderance of the evidence that Whiteside committed first degree murder. Based on the facts found above, the Court holds that it has not met that burden.

First, the Government failed to establish that Whiteside killed with premeditation.  The
Government argues that premeditated intent to kill can be inferred because: (i) Whiteside had a
motive to kill because Martino cheated him out of money and taunted him over the phone; (ii)
Whiteside planned and prepared to kill Martino by attempting to lure him to an Atlantic City
hotel and then by driving to the Metro Hotel where he knew Martino was staying; (iii) Whiteside
busted into Room 18 with his knife drawn, and then waited for Martino to exit the bathroom so
he could stab him; and (iv) Whiteside immediately fled New York.  Dkt. 88.

The Government's arguments are unavailing.  First, while Whiteside and Martino did
have a heated exchange over money in which Whiteside said he would kill Martino, the Court
interprets that exchange as billingsgate, not an expression of genuine intent to kill.  It is not clear
whether the violent threats were first made by Whiteside or by Martino.  What is clear is that
Smooth was laughing during the conversation, Martino told Whiteside his exact location at the
end of the conversation, and Martino acted nonchalantly after the call.  Tr. 141:5-142:21, 180:12-
181:21, 225:1-21.  Second, the Atlantic City incident demonstrates nothing more than a failed
attempt by Whiteside to arrange an in-person meeting to resolve the money dispute.  Third,
Whiteside did not enter Room 18 with a knife drawn; he drew the weapon in response to seeing a
gun in Martino's hand.  Finally, Whiteside did not "flee" New York—he continued on his
prearranged trip to East Brunswick to meet M.S., and then drove to a scheduled court appearance
in Providence.  Tr. 55:2-25, 58:2-9, 179:13-24.  Accordingly, the weight of the evidence does not
demonstrate a premeditated killing.

The Government also has not proven by a preponderance of the evidence that Whiteside
killed with malice aforethought.  The fatal knifing happened during a physical altercation and
only after Whiteside saw Martino holding a gun and reasonably feared for his life.  That is

19

enough to establish a "heat of passion" killing and negate the malice element. *Velazquez*, 246 F.3d at 210; *Roston*, 986 F.2d at 1291. Since Whiteside killed Martino without premeditation and in the heat of passion, the Court holds that the applicable crime of violence for Count 1 is voluntary manslaughter.[4] 18 U.S.C. § 1112(a).

## CONCLUSION

The Court holds that the applicable "crime of violence" for Count 1 is voluntary manslaughter, which corresponds to a base offense level of 29. U.S.S.G. § 2A1.3. The Court directs the Probation Office to prepare a revised PSR consistent with the holdings in this decision. Sentencing is scheduled for Wednesday, November 2, 2016 at 3:30 pm in Courtroom 14C.

Dated: New York, New York
       September 13, 2016

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[4] To the extent Whiteside now contends that the crime of violence is something less than voluntary manslaughter, the Court rejects that argument. By Whiteside's own admission, he voluntarily drove to the Metro Hotel with the intent to "physically confront" and "fight" Martino. Plea Hearing Transcript at 14:3-12; Tr. 182:1-6. Since Whiteside initiated the confrontation and killed Martino by stabbing him with a deadly weapon, his actions were not fully justified and were more than a simple assault.